UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| JESSICA ARELLANO, individually, and as next friend for Z.A., a minor child and wrongful death beneficiary of Alex Gonzales Jr., | § § § § § | |
| Plaintiffs, | § § | |
| v. | § § | CAUSE OF ACTION NO. 1:23-cv-8 |
| THE CITY OF AUSTIN; GABRIEL GUTIERREZ; and LUIS SERRATO, | § § § | |
| Defendants. | § § | |

## PLAINTIFF'S COMPLAINT

Plaintiff Jessica Arellano, individually, and as next friend for Z.A., a minor child and wrongful death beneficiary of Alex Gonzales, Jr., deceased, brings this 42 U.S.C. §1983 case against the City of Austin and Austin Police Department (APD) Officers Gabriel Gutierrez and Luis Serrato.

## I.    PARTIES

1.    Plaintiff Jessica Arellano is a resident of Austin, Texas.

2.    Z.A. is the minor child of Jessica Arellano and Alex Gonzales, Jr. Arellano brings claims in her individual capacity and as next friend of Z.A., a wrongful death beneficiary of Alex Gonzales, Jr., pursuant to Texas Civil Practice and Remedies Code section 71.004.

3.    Defendant Gabriel Gutierrez was at all relevant times a police officer with the Austin Police Department, and is sued in his individual capacity for compensatory and punitive damages. At all relevant times, Gutierrez was acting under color of law as an Austin Police

Department officer. Gutierrez may be served with process at 715 E. 8th Street, Austin, Texas, 78701.

4.    Defendant Officer Luis Serrato was at all relevant times a police officer with the Austin Police Department, and is sued in his individual capacity for compensatory and punitive damages. At all relevant times, Serrato was acting under color of law as an Austin Police Department officer. Serrato may be served with process at 715 E. 8th Street, Austin, Texas, 78701.

5.    Defendant City of Austin is a municipality that operates the Austin Police Department and employed Officers Gutierrez and Serrato at all relevant times. The City's policymaker for policing matters at the time of the incident was Police Chief Bryan Manley. Chief Manley has now been succeeded by Chief Joseph Chacon. The City may be served with process through its City Clerk, Myrna Rios, at 301 W. 2nd Street, Austin, TX 78701.

## II. JURISDICTION AND VENUE

6.    As this case is brought pursuant to 42 U.S.C. § 1983, this Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

7.    This Court has general personal jurisdiction over Defendants as they are located in, worked in, or resided in Travis County, Texas, which is in the Western District of Texas.

8.    This Court has specific *in personam* jurisdiction over Defendants because this case arises out of conduct by Defendants which occurred in Travis County, Texas, which is within the Western District of Texas.

9.    Venue of this cause is proper in the Western District of Texas, Austin Division pursuant to 28 U.S.C. § 1391(b) because a substantial portion of the events or omissions giving rise to Plaintiff's claims occurred in Travis County, which is within the Western District of Texas.

### III.  FACTS

**A. OFFICER GUTIERREZ SHOT JESSICA ARELLANO AND ALEX GONZALES WITHOUT JUSTIFICATION AND OFFICER SERRATO THEN SHOT AND KILLED ALEX GONZALES WITHOUT JUSTIFICATION**

10.     In the early morning hours of January 5, 2021, Jessica Arellano was riding as a passenger with Alex Gonzales, Jr. as he drove his vehicle with their two-month-old baby, Z.A., in the backseat.

11.     The family encountered Gabriel Gutierrez.

12.     As he was driving, Gutierrez allegedly cut in front of Gonzales's car.

13.     Gutierrez subsequently turned from E. Oltorf Street and headed southwest on Wickersham Lane, a two-lane residential road. Gonzales drove behind him. Gonzales also turned from E. Oltorf onto Wickersham Lane.

14.     Gutierrez stopped his vehicle in the right lane, presumably to confront Gonzales and his passengers. As he slowed down, Gonzales pulled his vehicle next to Gutierrez's vehicle on Gutierrez's left.

15.     Gutierrez could see into Gonzales' vehicle, so he saw that Arellano was seated in the front passenger seat while their child, Z.A., was seated in the rear on the passenger side.

16.     Within three seconds of Gonzales stopping his vehicle alongside Gutierrez's, and without issuing any warning, Gutierrez opened fire into Gonzales' vehicle.

17.     Gutierrez, at close range, rapidly and intentionally fired his handgun at least six times.

18.     Gutierrez shot Gonzales in the face and Arellano in the arm, back, and lungs.

19.     Gonzales did nothing to justify being shot by Gutierrez.

20.     Arellano did nothing to justify being shot by Gutierrez.

21.     Gonzales had blood pouring out of his face, was severely wounded and in a state of shock and fear.

22.     Gonzales' car slowly rolled forward and up onto the right-hand curb a short distance ahead.

23.     Arellano, despite being shot multiple times, attempted to step on the brake pedal to stop the car.

24.     Once the car stopped on the curb, Arellano desperately tried to exit the passenger side in an effort to check on Z.A. As she began to open the rear passenger door, she collapsed to the ground.

25.     Gutierrez followed Gonzales' car a short distance, then exited his own vehicle with his gun drawn.

26.     At no point during this series of events did Gonzales pose a threat of physical harm to Gutierrez, brandish a gun, or take any other aggressive action that would justify Gutierrez's use of lethal force against him or anyone else.

27.     Likewise, Jessica Arellano did nothing that posed any threat to Gutierrez or that would justify Gutierrez shooting her. She was simply sitting in the passenger seat visible to Gutierrez.

28.     Neither Gonzales nor Arellano had any reason to know or suspect that Gutierrez was an off-duty APD police officer or that he was armed and prepared to shoot them.

29.     Arellano had not harmed or threatened anyone prior to being shot by Gutierrez.

30.     Gonzales had not harmed or threatened anyone prior to being shot by Gutierrez.

31.     There was no objectively reasonable basis for Gutierrez to be afraid for himself or others. No reasonable police officer would have used deadly force against Arellano or Gonzales

in these circumstances.

32.     After firing at least six shots at Gonzales, Arellano, and their child, hitting both Gonzales and Arellano, Gutierrez called 911.

33.     Gutierrez told the 911 dispatcher he was an APD officer.

34.     Gutierrez informed the 911 dispatcher that Gonzales had blood all over his face and had been hit.

35.     Gutierrez also informed 911 that there was a female passenger in the vehicle—Arellano—and that she was lying on the ground crying out for her baby.

36.     The 911 operator asked if the female was pregnant or if a child was in the vehicle, further raising the prospect that a child was in the vehicle.

37.     Gutierrez made multiple false claims to the 911 dispatcher.

38.     Gutierrez falsely claimed that Gonzales had cut him off, rather than the other way around.

39.     Gutierrez also falsely claimed to the 911 operator that Gonzales pointed a gun at Gutierrez.

40.     Arellano, now on the ground by the passenger side of Gonzales' vehicle and unable to get up due to her injuries, cried several times: "My baby! My baby!"

41.     Gonzales exited his car, barely able to stand due to the bullet wound in his face.

42.     Gonzales was confused and slumped against the car to try to remain standing.

43.     Gutierrez had reason to know there was an infant in the passenger side of the car.

44.     Gutierrez heard Arellano crying out for her baby (Z.A.) who she feared had been killed in the hail of gunfire from Gutierrez.

45.     Gutierrez saw two people were badly injured, with a baby who also might be

injured.

46.     Gutierrez did not render aid.

47.     As Gonzales spoke to 911, he repeatedly turned his back to Gonzales and Arellano as he considered neither a threat.

48.     As a consequence of the 911 call, additional APD officers Luis Serrato and Brian Nenno arrived at the scene. Serrato and Nenno joined Gutierrez in holding Gonzales at gun point as he staggered to get to the passenger side to check on Arellano and their infant child.

49.     None of the responding officers rendered aid to Gonzales or Arellano despite knowing they had both been shot.

50.     In fact, Gutierrez told the officers he had shot Gonzales.

51.     The officers began shouting multiple, conflicting commands.

52.     Because Gonzales had been shot in the head at close range, a fact known to the officers present, Gonzales' hearing and ability to process what he could hear were, more likely than not, impaired, making it difficult for him to understand the conflicting commands of the officers, which experienced officers would know.

53.     Gonzales was also likely in shock, further impairing him, which experienced officers would know.

54.     Nevertheless, it was clear Gonzales was unarmed.

55.     There was no weapon in Gonzales' hands or on his person.

56.     Gonzales, weak from his injury and barely able to stand, never did anything threatening.

57.     As no one came to his, Arellano's, or Z.A.'s aid, Gonzales began stumbling toward the passenger side of the car, toward his wounded girlfriend and possibly injured child.

58.     Due to his gunshot wounds, Gonzales had difficulty walking and had to use the car to hold himself up.

59.     Gonzales followed the rear of the car towards the passenger side, wounded and needing to steady himself with his hands on the vehicle. Still, no one came to his aid.

60.     At all times, Gonzales's hands were in plain sight of officers. The officers saw that he had no weapon and thus posed no danger to them.

61.     As Gonzales reached the passenger side of the vehicle, he saw Arellano on the ground.

62.     Gonzales slowly turned to reach the rear passenger door, which was open.

63.     Gonzales slowly closed the door and looked down at Arellano, who was bleeding from her wounds.

64.     Gonzales then slowly re-opened the rear passenger door with his back to the officers.

65.     Gonzales' right hand remained visible on top of the rear passenger door.

66.     Gonzales gently leaned into the open door to check on his infant son, Z.A. He made no movements of any kind with his left hand.

67.     The officers saw that Gonzales was attempting to check on the welfare of his child, Z.A., who the officers had reason to believe was present.

68.     Without justification, Serrato opened fire at least ten times. Officer Nenno did not fire.

69.     Serrato killed Gonzales as he stood, unarmed, merely inches from his infant son, Z.A.

70.     At no point did Gonzales possess a weapons while Serrato was present, and at no

point did Serrato see a weapon in Gonzales's possession. Nor would it have been possible for Gonzales to reach into the driver's side seat or floor from his position.

71.    At no point did Gonzales make any aggressive move towards Serrato or any of the other officers on the scene.

72.    At no point did Gonzales take any action that would have provided any indication that he posed a danger to any officer or any bystander at the scene.

73.    No objectively reasonable basis existed to believe that Gonzales posed a threat to harm anyone, much less an immediate threat to do so.

74.    No reasonable police officer would have used deadly force against Gonzales, or any other citizen, in these circumstances.

**B.    THE CITY OF AUSTIN HAS A CUSTOM OF USING EXCESSIVE FORCE ON MINORITIES**

75.    Sadly, the Austin Police Department has a long, well-documented pattern of using excessive force, of using deadly excessive force disproportionately against minorities, of failing to discipline for excessive force, of training its officers to be militaristic warriors, of failing to remedy its pattern of excessive and disproportionate force, and of escalating rather than deescalating violence.

76.    Numerous incidents evidencing a pattern in which APD officers used excessive deadly force on minorities include the following instances (among others):

a.    **Daniel Rocha** – On June 9, 2005, then-Officer Julie Schroeder engaged in a struggle with Daniel Rocha, who was trying to flee an arrest. When Rocha turned away from her, Schroeder shot him in the back, killing him. This Court denied summary judgment on July 6, 2007 in a suit brought by Rocha's family. The lawsuit settled for

$1,000,000. Although it publicly defended the officer's conduct, APD has since admitted Schroeder's use of force was unreasonable.

b.     **Kevin Brown** – On June 3, 2007, APD Sgt. Michael Olsen fatally shot Kevin Brown, after Olsen chased Brown alone into a field. Olsen shot Brown multiple times including while Brown lay on the ground. Olsen rushed into the confrontation without a plan and then claimed that Brown appeared to be reaching for a weapon, even though Brown dropped his weapon moments earlier (and dozens of feet from where Olsen shot him). APD, through its former Chief of Police Art Acevedo, acknowledged that Olsen's use of force was unreasonable, and paid Brown's family a settlement of $1,000,000.

c.     **Sir Smith** – On May 11, 2009, then-APD-Officer Leonardo Quintana shot Sir Smith after approaching his car while he was unarmed and asleep. Quintana and another APD officer came up on the car from behind, and could tell through the car windows that both occupants were asleep. Instead of making a plan and communicating with his partner, Quintana opened fire on the car, shooting through the car's rear windows. Smith, unarmed and suddenly under fire, awoke from sleeping and tried to escape by running from the car, but Quintana shot him after he exited the car. Quintana was only disciplined for failing to activate his squad car's video camera, though an independent investigation by the City's Office of the Police Monitor sharply criticized APD's investigation. Quintana, upon information and belief, was not disciplined and the City defended the officer's conduct, although the City settled the lawsuit with Smith as well as the other individual he killed.

d.     **Carlos Chacon** – On April 29, 2011, APD Officers Eric Copeland and Russell Rose violently assaulted Carlos Chacon. Chacon had called the police to report he was the victim of a robbery. The officers alleged that Chacon failed to comply quickly enough with

their orders to lay on the ground, and began electrocuting him with their TASER while punching his body. Neither officer intervened to stop the other from assaulting Chacon. A jury awarded Chacon significant damages based on the officers' excessive force.

e.     **Byron Carter** – On May 30, 2011, Officer Nathan Wagner fatally shot Byron Carter, Jr., who was only 20 years old. Carter was in a vehicle driven by a 16-year-old child, L.W., while exiting a tight parallel parking space after 11:00 pm. Unbeknownst to Carter and L.W., Wagner and his partner were nearby on foot, and had been following Carter and L.W. surreptitiously without suspicion of any crime. L.W. heard Carter say, "go," in a fearful tone, so he accelerated out of the parking space. Wagner claimed that the car sped towards him and his fellow officer, and that he (incorrectly and implausibly) believed it struck his partner and was dragging him beneath the vehicle. As a result, Wagner fired his weapon five times into the driver's side doors as the car drove away. Wagner's shots wounded L.W. and killed Carter. Wagner's partner did nothing to intervene and stop the shooting, even as the car drove away. In ensuing excessive force litigation, The District Court for the United States Western District of Texas, Judge Lee Yeakel, denied summary judgment to Wagner on May 20, 2013. Although neither officer was disciplined by APD, then-Police Monitor Margo Frasier and a Citizen Review Panel told the then-chief that the shooting was unjustified. Like here, the APD officer shot the passenger who posed no danger to anyone—yet APD apparently condoned this deadly and unnecessary act despite its Police Monitor, a former Sheriff of Travis County and police practices expert, informing APD the actions were unreasonable after her review of the totality of the circumstances.

f.     **Ahmede Bradley** – On April 5, 2012, Officer Copeland (the same officer who abused Chacon, discussed above) shot and killed Ahmede Bradley during a traffic stop.

Copeland had not been re-trained or disciplined in any meaningful way after brutally beating Chacon. Bradley initially fled the stop, then pulled over again, exited his vehicle, and ran away on foot. Copeland angrily gave chase on foot and shouted that he would kill Bradley. Copeland electrocuted Bradley with a TASER, then kicked and struck Bradley before fatally shooting Bradley three times. This Court denied summary judgment on January 6, 2016. Then-Police Monitor Frasier, the former Sheriff of Travis County, told the then-chief that the shooting was unjustified, particularly because Bradley was trying to escape so that he was not an immediate threat requiring deadly force.

g.      **Pete Hernandez** – On June 7, 2012, APD Officer Jesus Sanchez used excessive force to tackle Pete Hernandez, whose only "crime" was exiting a Wal-Mart store. As Hernandez walked through the parking lot, an APD police officer suddenly yelled from behind him to "stay," and then, "get on the ground." Confused, Hernandez stopped—he testified that all he heard was to "Move out of the way," not "get on the ground"—and, less than four seconds after the first command, Sanchez executed a flying tackle into Hernandez, slamming him into the ground. Investigation revealed a third APD officer ordered police to "grab" Hernandez because he was supposedly walking toward a stolen truck occupied by another person. The ordering officer had incorrectly assumed Hernandez was an accomplice merely because he was walking through the parking lot, and because he was Hispanic. And Sanchez had, in turn, assumed that the order to "grab" Hernandez justified a flying tackle. None of the many APD officers present intervened to stop Sanchez's use of excessive force. Despite the fact that they injured and abused an innocent person, the City found Sanchez did not violate any policies. But a jury found Sanchez used excessive force, awarding Hernandez $877,000 on February 8, 2016 (later reduced on

remittitur). While the City later agreed to a settlement of $915,000, no one from APD's leadership apologized to the plaintiff and the City defended the conduct throughout the litigation.

h.     **Larry Jackson, Jr.** – On July 29, 2013, APD Det. Charles Kleinert fatally shot Larry Jackson, Jr. Kleinert chased Jackson on foot from a bank fraud call, and even requisitioned a civilian vehicle to continue the chase, before cornering Jackson alone under a bridge. Kleinert fired his gun at point blank range after engaging in a fist-fight with Jackson. Jackson was unarmed. Kleinert resigned in lieu of discipline, but APD acknowledges his use of force was unjustified and the City settled the family's civil claim for a total of $1,850,000.

i.     **Jawhari Smith** – In March 2014, APD Sgt. Greg White shot Jawhari Smith after confronting Smith when Smith was holding a small BB gun. Smith honestly and immediately told White that the "pistol" was just a BB gun and immediately held it up in his right hand over his head, *according to White*. Both Smith and a bystander reported Smith then quickly dropped the BB gun on the ground. White shot Smith, though his patrol car audio recording shows White gave Smith less than two seconds to comply with his commands to drop the BB-gun. APD did not discipline White, but the City paid Smith a settlement.

j.     **David Joseph** – On February 8, 2016, APD Officer Geoffrey Freeman shot a naked Black 17-year-old who was unarmed and running at him. Although the City and APD leadership acknowledged that the force was excessive, the City through its legal department defended the shooting and publicly denied it was unreasonable. The City paid a settlement of $3,250,000.

k.    **Jason Roque** – On May 2, 2017, APD Officer James Harvel shot at Jason Roque—who had been threatening to shoot himself in the head, but never threatened anyone else—three times, including twice after Roque dropped his BB-gun and was stumbling away from the police. Though four other APD officers were on the scene, none of them did anything to prevent Harvel from continuing to fire on Roque. Neither Harvel nor any of the four officers was disciplined. In ensuing litigation by Roque's survivors, the District Court for the United States Western District of Texas, Judge Lee Yeakel, denied summary judgment to Officer Harvel on March 23, 2020. Judge Yeakel's order was affirmed by the Fifth Circuit Court of Appeals in a published opinion, 993 F.3d 325, on April 1, 2021. While the matter subsequently settled for $2,250,000, APD never disciplined or retrained Officer Harvel despite video evidence showing him shooting an unarmed, injured young man in the middle of the street.

l.    **Landon Nobles** – On May 7, 2017, APD officers shot Landon Nobles in the back multiple times. Through Nobles was unarmed and presented no danger, APD Officers Richard Egal and Maxwell Johnson shot him. Rather than discipline them, the City has attempted to justify the wrongful shooting. A jury found the shooting unjustified and awarded $67 million to the family and estate. And when the City moved to reduce the award and overturn the verdict, Judge Mark Lane reduced the award to approximately $8 million but affirmed the jury's verdict that the shooting was unreasonable under the circumstances. Upon information and belief, none of the officers involved in the shooting have been disciplined or even reprimanded.

m.    **Javier Ambler** – On March 28, 2019, APD Officer Michael Nissen arrived at the scene of a car wreck caused by Williamson County Sheriff's deputies who had chased the

driver, Ambler, into Austin for allegedly failing to dim his headlights and not pulling over. As Nissen arrived, the deputies already had Ambler at gun point and had tasered him multiple times. The officers ordered Ambler, who was unarmed and visibly obese, to lay on the ground on his stomach. Ambler warned the officers, "I have congestive heart failure" and "I can't breathe" as they tried to force him to lie flat. Ambler told the officers he was trying to comply, but the officers insisted he flatten further despite his obvious inability to do so due to his obesity, and despite his repeated cries that "I can't breathe" and "I'm not resisting." Instead of stopping this, Nissen helped the deputies worsen Ambler's plight by pulling one of his arms further behind his back. The officers then shocked Ambler with the TASER again and put a knee into his back to press him further into the pavement before handcuffing him behind his back. Ambler stopped breathing following the excessive use of force Nissen participated in and easily could have stopped. As a result, Ambler died.

n.  **Michael Ramos** – On April 24, 2020, APD Officer Christopher Taylor shot and killed Michael Ramos, who was unarmed. Taylor and other APD officers pulled up to Ramos and a passenger sitting in his vehicle. They ordered Ramos to exit his vehicle at gunpoint. Ramos complied, begged them not to shoot, asked what was going on, and said he was not armed. When Ramos continued to stand with his hands up and complain that he had done nothing wrong, another APD officer, Mitchell Pieper, shot him with a "less lethal" weapon. In response, Ramos ducked back into the car and attempted to drive away from the police. As the vehicle moved away from the officers, Christopher Taylor shot into the cabin with a firearm, killing Ramos. Taylor has been indicted for murder, but not disciplined by APD. This lack of discipline is all the more disturbing as APD Chiefs Brian

Manley and Joseph Chacon, upon information and belief, consider the shooting to have been a violation of APD policies.

o.    **2020 Black Lives Matter Demonstrations** – Dozens of APD officers used deadly force to shoot non-violent demonstrators with kinetic projectiles fired from shotguns and 40 mm launchers. As a direct consequence, numerous people were shot unjustifiably and in retaliation for protesting abuse against minorities, and who suffered serious brain, head, and serious physical injuries. Among others, these include the unjustifiable shootings of Justin Howell, Anthony Evans, Alyssa Sanders, Levi Ayala, Jose Herrera, Bomani Barton, Maredith Drake, Christen Warkoczewski, Nicole Underwood, Sam Kirsch, and Arianna Chavez. Not a single officer, commander, Assistant Chief, or Chief of Police has been disciplined for the intentional use of 40 mm launchers or bean bag shotguns or the failure to intervene to stop their use during the protests, even though current Chief Chacon and his predecessor Manley personally knew that the weapons were being used inappropriately, dangerously, and against nonviolent people. More than twenty APD officers (none of whom are Black or Brown) have since been indicted for aggravated assault by a public servant for firing kinetic projectiles at people who, like Jessica Arellano and Alex Gonzales, posed no danger to anyone when they were shot. None of the indicted officers— not even the ones who shot Black and Brown people in the head who were doing nothing more than standing on a street—have been disciplined by the City or APD.

77.    Likewise, during the May 2020 protests, APD officers shot numerous protesters who were merely in the vicinity of other people allegedly throwing things and also fired their weapons from unsafe angles and distances. None of these officers who shot innocent people in this manner have been disciplined or retrained by APD leaders.

78.     APD's own reports reflect that its officers routinely use force against those who are not resisting at all.

79.     APD's reports reflect that from 2006 to 2016, APD used force against 1,159 people who only exhibited "passive" resistance, 838 people who only exhibited "verbal" resistance, and 6,626 who only exhibited "defensive" resistance.

80.     During the middle of 2017, APD changed its reporting metric so the type of resistance is not available during that year.

81.     From 2018 through 2020, for identified individuals, APD used force against at least 58 people who did not resist, 310 people whose resistance was "passive," and 4,148 people whose resistance was only "defensive."

82.     From 2017 to 2020, APD began using force 58% more often—while making 51% fewer arrests.

83.     During an independent review, authorized by the City of Austin, 112 uses of force (against 88 individuals) in late 2019 were found to be inappropriate, despite approval of the officers' use of force by APD supervisors.

84.     The same review found that the APD use of force process lacks proper internal supervisory review and investigation and frequently fails to address the appropriateness of the use of force used against members of the public.

85.     And in response to discovery in the litigation involving the death of Jason Roque, the City identified a disturbing pattern of deadly force on unarmed persons. In fact, according to the City, in the 13 years before the shooting of Jason Roque, APD shootings against Black and Hispanic people comprised 83% of all shootings of unarmed people, a percentage that is grossly disproportionate to the Black and Hispanic population.

86.    And tellingly, the City failed to count the shootings of Landon Nobles in the back (who a jury determined was unarmed when shot) and of Jason Roque, who was gunned down while stumbling unarmed and defenseless in the middle of the street. Thus, Black and Hispanic people comprise an even higher and more grossly disproportionate percentage of unarmed people shot by APD than even the City conceded.

C.  **THE APD TRAINED ITS POLICE OFFICERS TO ADOPT A PARAMILITARY CULTURE THAT CAUSED THEM TO ADOPT A "WARRIOR MINDSET" AND AN "US-VERSUS-THEM" APPROACH TO POLICING THAT PERMITTED, ENCOURAGED, AND TOLERATED EXCESSIVE FORCE AND A "SHOOT FIRST" MENTALITY**

87.    APD's long history of excessive force is unfortunately fostered by training and encouraging officers to use force far too quickly and far too often.

88.    For many years prior to the shooting of Jessica Arellano and Alex Gonzales, the City of Austin trained its police officers in ways that expressly and implicitly encouraged and approved of the use of excessive force in policing encounters with Austin residents. The Austin Police Department Training Academy used a training curriculum centered upon "paramilitary" training techniques that taught and reinforced a "paramilitary culture" throughout the APD. The APD Training Academy taught the officers to adopt a "warrior mindset" that encouraged an "us versus them" approach to citizen encounters during policing, especially non-white citizen encounters.

89.    On May 22, 2020, Dr. Sara Villanueva delivered to then-Chief Brian Manley a Review Analysis and Strategic Plan of the Austin Police Department Training Academy. At that time, Dr. Villanueva was the Organizational Development and Training Manager at the Austin Police Department. On information and belief, Dr. Villanueva prepared and delivered her report within the scope of her authority as an employee and agent of the City of Austin.

90.    After conducting a thorough "SWOT analysis" (assessing strengths, weaknesses,

opportunities, and threats) of the APD Training Academy, Dr. Villanueva reported that the APD Training Academy operated under a paramilitary training format that was inconsistent with preparing cadets to work in a manner consistent with a community-police services model.

91.    Dr. Villanueva further found that APD had a paramilitary culture and that its existence at APD's Training Academy promoted a warrior mindset and an adversarial approach to training where police are prepared like the military in a war zone to be on the front lines fighting against crime.

92.    On December 29, 2020, Austin Chief Equity Officer Brion Oaks delivered a memorandum to the Austin Mayor and City Council for the purpose of providing an overview of two bodies of work documenting racial inequities within APD, the Peace Mill Evaluations and the James Joyce Report.

93.    The Peace Mill Research and Communications' Evaluation of the APD Training and Recruiting Divisions was a series of evaluations prepared by a third-party evaluator that found that multiple former APD cadets expressed concerns that APD staff foster a culture of violence, embracing brutality over wisdom throughout the Academy.

94.    The Peace Mill Evaluations found that multiple cadets further alleged that the Academy was driven purely by brutality and that physical aggression was the primary quality that trainers sought when promoting cadets.

95.    The Peace Mill Evaluations further found that APD's Training Academy fostered a culture of violence that justified and legitimized direct or structural violence—manufacturing soldiers as officers rather than community-driven law enforcement professionals adept at de-escalation.

96.    The Joyce James Report was put together by Joyce James Consulting at the

direction of the Austin City Council. The Joyce James Report was delivered in November 2020 and found that African American and Hispanic/Latinx Austin residents experienced higher rates of use of force at the hands of APD, even when adjusted for poverty or other confounding factors.

97.     On January 18, 2021, a panel of Austin community members delivered a Community Report that provided a comprehensive assessment of training videos used in the training curriculum of the APD Training Academy. The Community Report was prepared with the authorization of the Austin City Council.

98.     The Community Report provides an assessment of videos and training materials that had been in use within the APD Training Academy for many years prior to the shooting of Plaintiffs.

99.      The Community Report states that the videos reviewed were chosen by leadership from the Austin Police Department and the Office of Police Oversight.

100.     The Community Report stated that the Academy's training videos demonstrated dehumanization and a lack of respect or humanity with how community members were portrayed in their interactions with APD officers.

101.     The Community Report found that APD's training videos demonstrated an "us-versus-them" mindset that reflected biases along race, ethnicity, gender, and disability. The Report further found that the Academy's training videos demonstrated a warrior mentality and a militarization of the police.

102.     The Community Report ultimately found that the Academy's training videos focus on control and the warrior mentality, reinforcing the us-versus-them dichotomy in ways that tend toward escalation and grievous mistakes in judgment, as well as increased instances of excessive force.

103.     On February 26, 2021, third-party consultant Kroll Associates, Inc. delivered to the City of Austin a Memorandum regarding Kroll's Preliminary Assessment of the Austin Police Training Academy. The Kroll Preliminary Assessment was prepared pursuant to the authorization of the Austin City Council.

104.     Despite the dramatic findings by Dr. Villanueva and the Community Review panel, persons with the APD training academy have been resistant to changing the police training curriculum. The Kroll Preliminary Assessment specifically found APD and Academy leadership are resistant to moving away from a paramilitary training academy, despite evidence that the Academy has fostered a "warrior" or "us-versus-them" mentality.

105.     On April 23, 2021, third-party consultant Kroll Associates, Inc. delivered to the City of Austin, Office of Police Oversight / City Manager's Office their Final Report on the Austin Police Department: Review and Assessment of Training Academy (herein the "Kroll Final Report").

106.     The Kroll Final Report states that the Academy has retained a predominantly paramilitary training model.

107.     Kroll further found that APD leadership has expressed its belief that the paramilitary structure is an essential component of police culture, despite evidence that this approach leads to greater instances of violence and an "us-versus-them" mentality.

108.     On information and belief, the City of Austin and the APD maintain other policies, practices, and customs that reinforce, encourage, and tolerate the paramilitary training of its police officers, the "warrior mindset," and the "us-versus-them" approach to policing. These policies and procedures include, without limitation, investigative approaches to incidents and complaints involving officer use of force and administrative / disciplinary approaches to incidents and

complaints involving officer use of force. On information and belief, these additional policies, practices, and customs reinforce and exacerbate the pervasive APD culture that permits, encourages and tolerates the use of excessive force by Austin police officers.

**D. APD CREATED, ENCOURAGED, AND TOLERATED A POLICING CULTURE THAT CAUSED OFFICERS TO USE EXCESSIVE FORCE DISPROPORTIONATELY ON MINORITIES**

109.    For many years prior to the shooting of Jessica Arellano and Alex Gonzales, who are Hispanic, the City of Austin adopted policies, practices, and customs that encouraged and tolerated a disproportionate use of excessive force targeted towards Hispanic and Black persons. The encouragement and toleration of the use of excessive force in a discriminatory manner was particularly engrained in the training methods and training materials used at the Austin Police Department Training Academy.

110.    On December 5, 2019, the Austin City Council adopted Resolution No. 20191205-066 ("Resolution 66").  Resolution 66 states that the City of Austin itself recognized that patterns of discrimination and bigotry pervaded Austin Police Department, which require investigation and reform.

111.    On December 28, 2020, the Peace Mill Evaluation of APD Training and Recruiting Divisions (described above) stated that OPO and APD investigations evidence serious gaps in APD's efforts to address racism and inequity in policing.

112.    Further, the Peace Mill Evaluations found that APD division leaders indicate that the department's commitment to anti-racism and the equity assessment process has been only superficial.

113.    Even more specifically, the Peace Mill Evaluations found that APD's Internal Affairs and Professional Standards division has few strategies in place to ensure racial equity and reflect a significant deficiency in the department's ability to implement principles of equity and

inclusion.

114.    On January 18, 2021, the Community Report found that the videos and other training materials being used by the APD Training Academy reflected harmful stereotypes perpetuated against Black and Brown communities and often showed people of color being brutalized.

115.    The Community Report further found that the videos repeatedly showed APD officers quickly killing men of color within seconds of an interaction with police and exceptionally few videos showing police de-escalating. Officers in the videos were found to quickly identify people of color as threats requiring force, regardless of if the subjects were armed or unarmed.

116.    On April 23, 2021, the Kroll Final Report found that the trainers at the APD Training Academy taught students to be biased in enforcing the law and that students drew the conclusion that bias was an inherent part of APD culture.

117.    On information and belief, the City of Austin and the APD maintain other policies, practices and customs that reinforce, encourage, and tolerate the disproportionate use of excessive force against Hispanic and Black citizens and in predominantly Hispanic and Black neighborhoods. These policies and procedures include, without limitation, investigative approaches to incidents and complaints involving officer use of force and administrative / disciplinary approaches to incidents and complaints involving officer use of force. On information and belief, these additional policies, practices, and customs reinforce and exacerbate the pervasive APD culture that encourages and tolerates racially disproportionate use of excessive force by Austin police officers.

E. **CITY OF AUSTIN POLICIES, PRACTICES, AND CUSTOMS DEMONSTRABLY CAUSED EXCESSIVE FORCE TO BE DISPROPORTIONATELY DIRECTED AT NON-WHITE PERSONS, PARTICULARLY IN BLACK AND HISPANIC COMMUNITIES.**

118.    For many years prior to the shooting of Jessica Arellano and Alex Gonzales, the City of Austin has exhibited a demonstrable racial bias in its policing practices, particularly with respect to the use of lethal force and excessive force against Hispanic and Black individuals and/or in predominantly Hispanic or Black neighborhoods. The racial bias in policing outcomes is a direct result of the policies, practices, and customs of the City of Austin and APD, including but not limited to the training methods used to train officers at the APD Training Academy.

119.    In 2016, the Center for Policing Equity conducted an assessment of City of Austin policing data for the years 2014 and 2015, and released a research report entitled "The Science of Policing Equity: Measuring Fairness in the Austin Police Department."

120.    The CPE Report found that Austin police officers used more force in the neighborhoods where Black and Hispanic Austinites live as compared to use of force in predominantly White neighborhoods. Even after adjusting for crime and poverty variables, the CPE Report found that Austin police officers' use of force in Black and Hispanic neighborhoods was disproportionate and unjustified.

121.    On December 5, 2019 Austin City Council Resolution 66 recognized racial biases in APD policing practices and policing outcomes.

122.    In November 2020, the Joyce James Report further documented the racial bias and disparities in the APDs use of lethal force and excessive force. The report found that Austin residents that lived in predominantly Black or Latinx neighborhoods had disproportionate force and severity of force used upon them.

123.    The City of Austin does not dispute that its City Council recognized biases in APD

policy practices and policing outcomes

124.    The City of Austin does not dispute that the Joyce James Report found that Austin residents that lived in predominantly Black or Latinx neighborhoods had disproportionate force and severity of force used upon them.

125.    Moreover, according to the City, a much higher percentage of unarmed persons shot by APD are Black or Hispanic than demographics would suggest. In fact, as of 2018, 83% of unarmed people shot by APD since 2004 were Black and Hispanic.

126.    And in many instances, despite policymakers' knowledge of unreasonable uses of force, including deadly force, APD policymakers defend publicly the abusive conduct or stay silent and refuse to condemn the conduct, thereby sending the dangerous message to APD officers that excessive force is tolerated by APD's leaders.

### IV.  CAUSES OF ACTION

#### A. Fourth and Fourteenth Amendment Excessive and Conscience Shocking Force by Defendants Gutierrez and Serrato

127.    Defendant Gutierrez, while acting under color of law, shot Jessica Arellano and Alex Gonzales, Jr. when they posed no danger to anyone.

128.    Under the authority granted to him by the APD General Orders as an off-duty officer, Gutierrez made a decision to intervene with respect to Alex, Jessica, and Z.A., and Gutierrez undertook law enforcement actions with respect to Alex and Jessica, including but not limited to using deadly force on Alex and Jessica without any warning.

129.    Defendant Serrato, while acting under color of law, shot Alex Gonzales, Jr. when he posed no danger to anyone.

130.    Both Gutierrez and Serrato's use of force was wholly excessive to any conceivable need, objectively unreasonable in light of clearly established law, and directly caused Alex and

Jessica to suffer serious injuries. Therefore, both Gutierrez and Serrato's actions violated Alex and Jessica's clearly established Fourth Amendment right to be free from excessive force and unreasonable seizure.

131.    Further, both Gutierrez and Serrato's intentional use of force caused Alex and Jessica's injuries, was grossly disproportionate to the need for action under the circumstances, and was inspired by malice or excess of zeal such that it amounted to abuse of official power that shocks the conscience. APD Officers Gutierrez and Serrato shot Alex and Jessica with a lethal weapon, causing death and very serious injuries, while neither Jessica nor Alex did anything to warrant the use of deadly force.

132.    Therefore, APD Officer Gutierrez also violated Alex and Jessica's clearly established Fourteenth Amendment substantive due process and Fourth Amendment rights to be free from excessive force in such a way that is unreasonable and clearly shocks the conscience.

133.    As a direct and proximate result of Defendants Gutierrez and Serrato's actions, Alex died of his wounds, Jessica suffered and continues to suffer significant injuries, and Z.A. lost a father.

134.    This claim is brought pursuant to 42 U.S.C. § 1983.

**B. FOURTH AND FOURTEENTH AMENDMENT *MONELL* CLAIM AGAINST DEFENDANT CITY OF AUSTIN ONLY**

135.    Plaintiff incorporates by reference all of the foregoing and further alleges as follows:

136.    The conduct by Officers Gutierrez and Serrato discussed in this complaint and described herein constituted excessive and/or conscience shocking force in violation of the Fourth and/or Fourteenth Amendment.

137.    At all material times, including when Jessica and Alex were shot, Gutierrez and

Serrato acted under color of state law.

138.    Defendant City of Austin's policymaker for all matters related to the activities of the Austin Police Department at the time Jessica Arellano and Alex Gonzales were shot was Brian Manley. APD's policymaker now is Joseph Chacon, who was an Assistant Chief at APD on January 5, 2021.

139.    As more fully described earlier, Defendant City of Austin had the following policies, practices, and customs in place prior to and on January 5, 2021:

- Using force and deadly force unreasonably;

- Disproportionately using force and deadly force unreasonably against minorities;

- Using deadly force disproportionately against minorities;

- Failing to discipline officers for use of unreasonable force and deadly force;

- Training APD officers to function as militaristic warriors who employ an us-versus-them mentality and encouraging disproportionate force to be used on minorities;

- Defending unreasonable uses of force publicly;

- Failing to discipline officers for using unreasonable force or shooting bystanders;

- Delaying discipline of officers who used unreasonable force or who shot bystanders; and

- Shooting bystanders and/or innocents who pose no danger to anyone.

140.    Prior to and on January 5, 2021, each of the policies, practices, and customs alleged above was part of a persistent and widespread pattern at the Austin Police Department.

141.    Prior to and on January 5, 2021, each of the policies, practices, and customs alleged above was constructively and actually known to the City of Austin's policymakers, including then Chief Manley and now Chief Chacon. Despite this, City of Austin policymakers did not remedy these dangerous policies and training inadequacies. Rather, the City of Austin ratified, adopted, or

approved of each of the alleged policies, practices, and customs prior to and on January 5, 2021. One or more Austin policymakers acted with deliberate indifference to the pattern of unreasonable and discriminating force alleged herein as well as the known and obvious consequences of the identified policies, practices and customs that made it likely and predictable that Austin citizens' constitutional rights and, in particular, Jessica's and Alex's constitutional rights would be violated.

142.    The identified Austin policies, practices, and customs were the moving force that caused the violation of Jessica Arellano's and Alex Gonzales' constitutional rights and the injuries and damages suffered therefrom. Gutierrez and Serrato received their police training through the APD training academy, in which each was trained within a paramilitary culture that taught him a "warrior mindset" and an "us-versus-them mentality" that encouraged and promoted excessive force. Defendants were taught, through the APD Training Academy, to perceive Hispanic individuals in predominantly Hispanic neighborhoods as an inherent and imminent threat of danger. Based on reports and upon information and belief, Defendants were taught, through the APD Training Academy, policing methods that encouraged acceleration of force and quick use of lethal force when responding to incidents involving minorities. Gutierrez shot Jessica and Alex in an area of Austin that is an overwhelmingly Hispanic population center. And Jessica Arellano and Alex Gonzales were shot in the same neighborhood in which APD officer Christopher Taylor shot and killed Mike Ramos less than one year earlier, in another particularly high-profile officer-involved shooting the City's former Chief of Police, Brian Manley, and current Chief of Police, Joe Chacon, acknowledge was unreasonable in light of the circumstances facing Taylor and for which Taylor has been indicted for murder.

143.    Based on the foregoing policies, alleged training deficiencies, and APD policymakers' ongoing refusal to discipline officers for unreasonable uses of force and deadly

force, as well as their defense of some officers shooting or assaulting people who posed no danger to anyone, Gutierrez and Serrato believed that their conduct would meet with the approval of supervisors and other Austin investigators of the events because of the policies and practices alleged herein.

144.    Furthermore, the City of Austin has further ratified the policies, practices, and customs alleged above by failing to conduct an adequate internal investigation of the shooting of Jessica and of Alex, by failing to take appropriate disciplinary and/or administrative action with respect to Gutierrez and/or Serrato for shooting Jessica or Alex, and by failing to implement changes to its dangerous or inadequate policies, practices and customs in response to the shooting of Jessica, and other similar incidents.

145.    Consequently, the policies delineated above were not only known to APD policymakers, they were enacted with deliberate indifference and were the moving force of the constitutional deprivations and injuries to Alex and Jessica, and caused Plaintiff's damages.

## V.  DAMAGES

146.    This claim is brought pursuant to 42 U.S.C. §1983.

147.    Plaintiff Jessica Arellano, individually, seeks the following damages:

    a.    Past and future lost wages and loss of earning capacity;

    b.    Past and future physical pain;

    c.    Past and future mental anguish;

    d.    Past and future impairment;

    e.    Past and future disfigurement;

    f.    Past and future medical expenses;

     g.     Punitive damages in the highest amount allowed by law against Defendant Gutierrez only;

     h.     Attorneys' fees and costs pursuant to 42 U.S.C. §1988.

148.    Plaintiff Jessica Arellano, as next friend for Z.A., seeks the following damages for the wrongful death of Alex Gonzales, including

     a.     Past and future mental anguish;

     b.     Past and future loss of companionship and society;

     c.     Past and future pecuniary loss, including loss of care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value;

     d.     Punitive or exemplary damages in the highest amount allowed by law against Defendants Serrato and Gutierrez only;

     e.     Attorneys' fees and costs pursuant to 42 U.S.C. §1988; and

     f.     All other economic damages to which Plaintiff may be entitled.

## VI.  JURY DEMAND

149.    Plaintiff respectfully requests a trial by jury.

## VII.  PRAYER FOR RELIEF

150.    To right this grave injustice, Plaintiff, individually and as next friend for Z.A., a minor, requests the Court:

     a.     Award compensatory damages against all Defendants;

     b.     Award punitive damages against Defendants Gutierrez and Serrato only;

     c.     Award costs, including expert fees and attorneys' fees pursuant to 42 U.S.C. § 1988;

     d.     Award pre-judgement and post-judgment interest at the highest rate allowable under the law; and,

     e.     Award and grant such other just relief as the Court deems proper.

Dated: January 3, 2023

Respectfully submitted,

**EDWARDS LAW GROUP**
603 W. 17th St.
Austin, TX 78701
Tel.  512-623-7727
Fax.  512-623-7729

By_____/s/ Jeff Edwards_____
        JEFF EDWARDS
        State Bar No. 24014406
        jeff@edwards-law.com
        DAVID JAMES
        State Bar No. 24092572
        david@edwards-law.com
        PAUL SAMUEL
        State Bar No. 24124463
        paul@edwards-law.com

**ATTORNEYS FOR PLAINTIFF**